

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-09-001-CV

IN THE INTEREST OF V.R., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### Introduction

Appellants S.P. and M.R. appeal the trial court's order terminating their parental rights to their child V.R.[2]  They each argue in three issues that the evidence is legally and factually insufficient to support the trial court's statutory termination findings and its best interest finding.  We affirm.

------------

[1] *See* Tex. R. App. P. 47.4.

[2] To protect the privacy of the parties involved in this appeal, we identify them by initials only.  *See* Tex. R. App. P. 9.8(b); Tex. Fam. Code Ann. § 109.002(d) (Vernon 2008).

**Background Facts**

In 2005, S.P. gave birth to V.R.'s older half-brother D.R. The Texas Department of Family and Protective Services (Department) removed D.R. from S.P.'s care because of her cocaine and alcohol abuse during pregnancy. S.P.'s parental rights to D.R. were terminated in August 2007 when she failed to complete any of her service plan; D.R. has since been adopted by his foster family.[3] S.P. was pregnant with V.R. when her rights to D.R. were terminated.

S.P. gave birth to V.R. on October 21, 2007. The Department removed V.R. from S.P. at the hospital after a nurse informed the Department that S.P. had tested positive for opiates. The nurse told the Department that S.P.'s positive test could have been the result of pain medication the hospital had given her;[4] nevertheless, the Department was concerned because of S.P.'s taking drugs while pregnant with D.R.[5] In addition, the Department was not able to quickly find a suitable family placement.

---

[3] The termination order in D.R.'s case reflects that M.R., V.R.'s father, is not D.R.'s father.

[4] M.R. and S.P. testified that S.P. had tested positive for opiates only because she had been given Vicodin at the hospital for an earache (S.P.'s testimony) or a toothache (M.R.'s testimony) before her labor was induced. S.P. and M.R. believed that it was okay for S.P. to take Vicodin because doctors at the hospital gave it to her.

[5] V.R. never tested positive for any drugs.

S.P. testified that she had obtained a prescription for Vicodin for false labor contractions in September 2007, a month before V.R.'s birth, but that she never filled the prescription. She had received another prescription for Vicodin a few weeks earlier for pain between her leg and pelvis; she testified that she did not get that prescription filled either. She was also hospitalized in March, May, and June 2007, but she denied that she was taking drugs at the time of those visits.

In April 2008, after V.R. had been removed and while S.P. was supposed to be working her service plan, S.P. tested positive for codeine. At trial, she explained that the drug test was positive because she had gone to the hospital for a sprained ankle and was given a Vicodin pill. According to S.P., the doctor tried to give her a prescription at that time but she refused to take it.

The Department did not produce any evidence that S.P. had actually filled her Vicodin prescriptions, but it did elicit testimony from S.P. that she had lied about her past drug problems during her hospital visits, which implied to the Department that S.P. may have obtained the Vicodin under false and nefarious

3

pretenses.[6]  S.P.'s caseworker testified that she believed S.P. was abusing prescription drugs.

At the time of trial, S.P. was in this country illegally and did not have a green card or a driver's license (although she testified that this did not prevent her from driving); however, she had applied for a green card, had lived here for twenty-three years, went to public school, and could speak fluent English.  She has a history of abusing drugs, having admitted to cocaine use in 2005 and during her pregnancy with D.R.  S.P. overdosed on cocaine in 2005 and was hospitalized, but she testified that she last used cocaine in that year[7] and that she had not used any drugs while this case was pending other than the prescribed Vicodin.  She was unemployed.

---

[6] S.P. agreed that if she had been honest with nurses and doctors and told them that she had a drug history, they may have prescribed other nonnarcotic substances to her during her hospital stays.

[7] According to the testimony of Laurie Smith, a licensed chemical dependency counselor, S.P. admitted taking cocaine in the past to treat a tooth infection.  S.P. admitted at trial that in summer 2006, she had put cocaine "in" her tooth to treat an infection.

M.R., V.R.'s father,[8] also has a history of abusing cocaine, which he admitted using when V.R. was born. However, he said that he only used drugs on a once-per-week basis for a three-month period ending in January 2008. Although he tested positive for cocaine in April 2008, after V.R.'s removal, he contended that it resulted from his January 2008 drug use.[9] A licensed drug counselor for Tarrant County MHMR testified, however, that when M.R. attended group counseling in July 2008, he told the group that he was there because he had "relapsed." M.R. further testified that he had taken every drug test the Department had asked him to take, that all drug tests had been negative since April 2008, and that S.P. did not know about his drug use.[10] M.R. knew about S.P.'s drug use, however, including the circumstances of D.R.'s removal and termination.

---

[8] The Department alleged that M.R. is V.R.'s alleged father. M.R. admitted paternity in his request for counsel and referred to V.R. as his daughter during trial; thus, termination would not have been proper under section 161.002 of the family code. *See* Tex. Fam. Code Ann. § 161.002 (Vernon 2008) (relating to termination of rights of an alleged biological father); *In re K.W.*, 138 S.W.3d 420, 430 (Tex. App.—Fort Worth 2004, pet. denied) (holding that letters to the Department and to the court comprised an admission of paternity under the termination statute).

[9] The test was a hair follicle test rather than a urinalysis.

[10] S.P. testified that she did not know about M.R.'s drug use but that he knew about hers.

M.R. was also in this country illegally and did not have a green card or a driver's license.[11]  He admitted that he could be deported at any time.  He testified that he worked sixty to seventy hours a week helping his cousin install marble bathroom floors; he was paid in cash and did not pay taxes.

The Department filed its original petition on October 24, 2007, three days after V.R.'s birth.  The Department placed V.R. in the same licensed foster home as D.R.  She has lived there all of her life, and her foster parents are interested in adopting her.  She was one year old at the time of the termination trial, at which time S.P. was pregnant again.

The Department filed its service plan in December 2007.  At that time, the Department's goal was to reunify V.R. with her parents.  The service plan required the parents to maintain employment, maintain stable housing, obtain green cards, complete various classes and assessments, and take random drug tests.

M.R. and S.P. affirmed that the Department explained the service plan to them, that they understood the service plan's requirements, that they understood the importance of following the service plan to their continued relationship with V.R., and that all of the services in the plan were available to

---

[11] M.R. does not speak English; he participated at trial through an interpreter.

6

them without any cost. A Department caseworker testified that she reviewed the service plan with M.R. and S.P. on seven dates over the course of the trial court's proceedings and that she discussed the "need for them to complete the services so they would have the opportunity to show the Court they would provide a safe and secure environment" for V.R.

In April 2008, the Department filed a service plan review. The review indicated, among other facts, that (1) V.R.'s foster mother provided a "child proofed" home and "educationally appropriate toys and activities" for V.R., (2) S.P. and M.R. had completed parenting classes and had tested negative for drugs from November 2007 to February 2008, and (3) S.P. and M.R. were appropriate and loving during their visits with V.R., and they also had a home that was "clean, appropriate, and child proofed." The review stated, however, that S.P. and M.R. needed to change their behavior by demonstrating an ability to support themselves and V.R. and by demonstrating a crime-free and drug-free lifestyle.

The Department's goal to reunify V.R. with her parents remained until August 2008, when its goal became termination and adoption because the parents had apparently become disinterested in completing their service plan, had tested positive for drugs (opiates for S.P. and cocaine for M.R.) in April of that year but had denied having drug problems, and had remained "illegal

7

immigrants with the risk of being deported." Additionally, although S.P. and

M.R. had been telling their caseworker that they had been attending Narcotics

Anonymous (NA) meetings regularly,[12] the caseworker testified that they did

not provide verification when pressed. M.R. and S.P. testified that they did

show the caseworker a sign-in sheet once but that she just looked at it and

gave it back to them.

At the time of trial in October 2008, S.P. and M.R. had been dating for

over two years and had lived in the same apartment for over a year. Although

they were not married, S.P. testified that they planned to marry sometime in

the future. They had completed the parenting classes and psychological

evaluations that the Department required in their service plan. But although

they both had attended at least some classes related to their drug use

(Community Addiction Treatment Services (CATS)[13] and ROADS), they failed

---

[12] M.R. testified that he went to NA meetings from about February or March to July. S.P. testified that she went from April through May.

[13] S.P. went to CATS evaluations because of referrals from the Department in December 2007 and May 2008. CATS did not admit her to the program in 2007 because she "denied any illicit drug use at that time." But after her positive drug test in April 2008, she was again referred to CATS. After an evaluation in May 2008, CATS recommended that S.P. complete twenty-eight two-hour group classes and four one-hour individual classes—this is the standard recommendation in Department referrals for significant narcotics abuse. S.P. completed only five group classes and one individual class, and she did not complete any classes after July 1, 2008, although CATS provided free transportation to and from the classes. M.R. testified that he also did not

to complete the recommended course of classes.[14]  Further, neither completed

the additional psychological counseling recommended.

S.P. attended some but not all scheduled visits with V.R.  She was also

fifteen to twenty minutes late to at least some of the hour-long visits.[15]  M.R.

did not attend many visits because of his work schedule.

After multiple permanency hearings and a bench trial, the trial court

terminated both S.P.'s and M.R.'s parental rights to V.R.  The court cited its

reasons for termination as those contained in subsections 161.001(1)(D), (E),

and (M) of the family code as to S.P. and those in subsections 161.001(1)(D)

and (E) as to M.R.[16]  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (M).  The

---

complete the CATS classes.

[14] The record does not indicate what the acronym ROADS stands for, but it does indicate that it is a substance abuse education class aimed at recovery.  M.R. testified that the ROADS classes were difficult to complete for him because he was "battling with [his] Spanish."  When asked what part of the service plan she successfully completed, S.P. testified, "My psychological, my parenting.  That's about it."  She also stated that even in those two classes, she participated in only fourteen hours of services.

[15] A Department caseworker testified that S.P. was late to all of her visits; S.P. admitted that she was late to two visits.

[16] Subsection 161.001(1)(D) provides grounds for terminating the rights of a parent who knowingly places or knowingly allows a child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child.  Tex. Fam. Code Ann. § 161.001(1)(D) (Vernon 2008).  Subsection 161.001(1)(E) provides grounds to terminate the rights of a parent who engages in conduct or knowingly places the child with persons who

9

court also found that termination of both parents' rights was in V.R.'s best interest. *See id*. § 161.001(2). The trial court denied the parents' motions for new trial, and the parents filed their notices of this appeal.

## Standards of Review

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.*

---

engage in conduct that endangers the physical or emotional well-being of the child. *Id.* § 161.001(1)(E). Subsection 161.001(1)(M) applies to a parent who has had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of paragraph (D) or (E). *Id.* § 161.001(1)(M). The order terminating S.P.'s rights to D.R. (V.R.'s half-brother) was based on findings under subsections 161.001(1)(D) and (E).

§ 101.007 (Vernon 2002). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

**Legal sufficiency**

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *see In re Z.C.*, 280 S.W.3d 470, 474 (Tex. App.—Fort Worth 2009, pet. denied). We must review all the evidence in the light most favorable to the finding and judgment. *J.P.B.*, 180 S.W.3d at 573; *see Z.C.*, 280 S.W.3d at 474. This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *J.P.B.*, 180 S.W.3d at 573; *see Z.C.*, 280 S.W.3d at 474. We must also disregard all evidence that a reasonable factfinder could have disbelieved. *J.P.B.*, 180 S.W.3d at 573; *see Z.C.*, 280 S.W.3d at 474.

We must consider, however, undisputed evidence even if it is contrary to the finding. *J.P.B.*, 180 S.W.3d at 573; *see Z.C.*, 280 S.W.3d at 474. That

11

is, we must consider evidence favorable to termination if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *J.P.B.*, 180 S.W.3d at 573; *see Z.C.*, 280 S.W.3d at 474.

We must therefore consider all of the evidence, not just that which favors the verdict. *J.P.B.*, 180 S.W.3d at 573. But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573–74. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

**Factual sufficiency**

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provisions of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the

12

truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## Findings Under Subsections 161.001(1)(D) and (E)

In their first two issues, S.P. and M.R. contend that the evidence is legally and factually insufficient to support the trial court's findings under subsections 161.001(1)(D) and (E).

**S.P.'s Appeal**

Along with a best interest finding, a finding of only one ground alleged under family code section 161.001(1) is sufficient to support a judgment of termination. *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). Although S.P. appeals the court's findings under subsection (D) and (E), she failed to challenge its finding under subsection (M): that her parental rights to another child had been terminated under subsection (D) or (E).[17] In fact, she confirmed at trial that her rights to D.R. had previously been terminated because she abused drugs during and after her pregnancy with him. Based on this finding alone, the trial court had a sufficient basis to terminate S.P.'s rights under section 161.001(1). *See Fletcher v. Dep't of Family & Protective Servs.*, 277 S.W.3d 58, 64 (Tex. App.—Houston [1st Dist.] 2009,

---

[17] The Department pled subsection (M) in its original petition as a ground for termination of S.P.'s parental rights.

13

no pet.); *In re B.K.D.*, 131 S.W.3d 10, 16 (Tex. App.—Fort Worth 2003, pet. denied) (explaining that "to be successful on appeal, the appellant must establish that the . . . findings on all of the [Department's] pleaded grounds are unsupported by the evidence"); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.—El Paso 2000, no pet.) (holding that because the appellant "failed to challenge the legal or factual sufficiency of the evidence with regard to [one of the statutory provisions], the first element of involuntary termination c[ould] be affirmed based on th[at] provision").

Because S.P. failed to challenge at least one ground for termination, we normally would not address the sufficiency of the evidence supporting the trial court's findings as to the other two grounds. However, because the evidence relevant to those two grounds is also relevant in evaluating the findings as to M.R., we will address them as well.

Endanger means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). To prove endangerment under subsection (D) of section 161.001(1), the Department had to prove that S.P. (1) knowingly (2) placed or allowed V.R. to remain (3) in conditions or surroundings that endangered her physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D); *Z.C.*, 280

14

S.W.3d at 474. "Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being." *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.—Fort Worth 2008, no pet.). But to support a finding of endangerment, "the parent's conduct does not necessarily have to be directed at the child nor is the child required to suffer injury." *Id.* at 169.

Under subsection 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *J.T.G.*, 121 S.W.3d at 125. Additionally, termination under subsection 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. Tex. Fam. Code Ann. § 161.001(1)(E); *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *R.W.*, 129 S.W.3d at 739. Drug use and its effect on a parent's life and his or her

15

ability to parent may establish an endangering course of conduct. *Id.*; *see Z.C.*, 280 S.W.3d at 474 (stating that a parent's "drug use and drug-related criminal activity may support a finding that the child's surroundings endanger his [or her] physical or emotional well-being"). Further, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child. *Id.* To determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.); *see In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g) (explaining that the "factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent"). Because the evidence concerning the two statutory endangerment grounds for termination is interrelated, we consolidate our examination of it. *See M.C.T.*, 250 S.W.3d at 169; *In re S.D.*, 980 S.W.2d 758, 762 (Tex. App.—San Antonio 1998, pet. denied); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied) (recognizing the link between a parent's conduct and a child's conditions and surroundings).

The trial court could have reasonably inferred that S.P. sought out Vicodin prescriptions under false pretenses,[18] took that drug while pregnant with V.R., and, as a result, tested positive for that drug at V.R.'s birth and at times after her birth; this evidence shows a continuing course of endangering conduct that is likely to continue in the future, especially when considering S.P.'s refusal to participate in the service plan's drug treatment programs and her refusal to admit that she has a drug problem. *See Z.C.*, 280 S.W.3d at 474. Her poor choices in the past related to her cocaine and alcohol use during her pregnancy with D.R. are also evidence of the potential for future endangerment of V.R. *See M.R.J.M.*, 280 S.W.3d at 502. Thus, S.P.'s drug history and her drug use before and during these proceedings (regardless of the medical reasons for which she claims she took the drugs) sufficiently supports the trial court's endangerment findings under the evidentiary review standards described above. *See Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied); *In re U.P.*, 105 S.W.3d 222, 234 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)

---

[18] The trial court, as the finder of fact, was entitled to resolve the disputed theories regarding the wrongfulness of S.P.'s opiate use, which S.P. admitted may have been related to her misrepresentations to doctors. *See J.P.B.*, 180 S.W.3d at 573.

17

(explaining that endangerment includes evidence of drug addiction before and after a child's birth).

For all of these reasons, we overrule S.P.'s first and second issues.

**M.R.'s Appeal**

In his first two issues, M.R. argues that the evidence is legally and factually insufficient to support the trial court's endangerment findings as to his conduct.

M.R. has admitted to abusing cocaine; he tested positive for cocaine as recently as six months before the termination trial.[19] He failed to complete his substance abuse classes, and he refused to admit to his therapist that he had a drug problem. Although he insisted that he had not used drugs since January 2008 and that the results of the April 2008 hair follicle test were related to his January drug use, one of his drug counselors testified that M.R. told his group in July 2008 that he had relapsed. M.R. knew that S.P. had abused cocaine and that her rights to D.R. had been terminated for that reason. In addition, the trial court could have reasonably inferred that M.R. facilitated S.P.'s obtaining Vicodin during her pregnancy with V.R. He was also in this country illegally

---

[19] M.R. has conceded on appeal that he tested positive for cocaine in November 2007 and in April 2008; the termination trial occurred in October 2008.

and did not have a green card or a driver's license. He admitted at trial that he could be deported at any time.

M.R.'s appeal is admittedly a closer case than S.P.'s appeal, as there is evidence that M.R. could possibly be an adequate parent if a few circumstances changed.[20] At trial, ad litem counsel for V.R. even acknowledged that if M.R. was not still living with S.P., he would have a better chance of avoiding termination. However, S.P. testified that she and M.R., rather than planning a separation, were planning to be married. Although M.R. knew that S.P.'s rights to D.R. had been terminated, he testified that S.P. would be responsible for V.R.'s care while he worked long hours. These facts indicate that V.R. would continue to be exposed to S.P.'s continuing course of endangering conduct.

We have carefully reviewed the entire record. Giving due consideration and deference to all of the evidence, we hold that the trial court could have reasonably formed a firm belief or conviction that M.R. endangered V.R. We therefore hold that the evidence is legally and factually sufficient to support termination, and we overrule M.R.'s first and second issues.

---

[20] M.R. apparently had some difficulty finding classes in Spanish so that he could understand them. He did not attend visits with V.R. regularly because he works long hours supporting himself and S.P., who is unemployed.

19

**Best Interest of V.R.**

In their third issues, M.R. and S.P. contend that the evidence is insufficient to prove that termination of their rights is in V.R.'s best interest.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002).

Among others, factors considered in evaluating the parents' willingness and ability to provide the child with a safe environment include the child's age and physical and mental vulnerabilities; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116; *M.R.J.M.*, 280 S.W.3d at 506.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371−72 (Tex. 1976); *M.R.J.M.*, 280 S.W.3d at 506−07.

Some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the

21

child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

V.R. was only one year old at her termination hearing and was thus at a vulnerable age; however, she was physically and emotionally healthy and developmentally on target. Her mother and father both had substance abuse issues: S.P. had a history of cocaine abuse leading to the termination of her rights to another child, she had lied about that abuse during her hospital stays, she had lied about her parental history to Department personnel, she had used opiates several times during the course of this case, and she had not completed or made a good-faith attempt to complete the drug-related services available to her. M.R. likewise was using cocaine around the time of V.R.'s birth and tested positive for cocaine during the pendency of this case.

There is no indication in the record that either S.P. or M.R. has extended family or friends capable of providing support to V.R. S.P. had named an aunt as a possible placement, but the Department was never able to determine if the home was suitable because S.P.'s approximately eighty-year-old grandmother, who also lived in the home and who would be responsible for some of V.R.'s care, was in Mexico, and the Department could not interview her. M.R. had recommended his parents in Mexico, and the trial court had signed an order

allowing for a home study to be done, but there was no evidence at trial regarding their home as a potential placement for V.R.

V.R. was too young to have her desires meaningfully considered. S.P. had demonstrated that she did not have adequate parenting abilities. D.R. was born with drugs in his system, and S.P. failed to get prenatal care while pregnant with him; she continued to use drugs while pregnant with V.R., despite having had her rights to D.R. terminated; and she took Vicodin again after V.R. had been removed. According to the affidavit attached to the Department's petition, S.P. had twice been placed in a mental hospital for unknown reasons. She was not employed. She did not have a green card or a driver's license even though the Department requested that she obtain those documents. Although she had completed parenting classes, she failed to complete the recommended counseling, including drug counseling. M.R. likewise completed parenting classes but not counseling; furthermore, because of his work schedule, primary parenting responsibility for V.R. would fall to S.P.[21]

---

[21] The Department expressed its concern that even if M.R. had not used drugs in the several months preceding trial, as he testified to, his failure to complete the drug-related portions of his service plan reduced his ability to remain drug-free. It also expressed its concern that M.R. never intervened in S.P.'s drug use.

23

Neither S.P. nor M.R. expressed any plans for V.R., and neither had offered any excuses for their behavior. Finally, S.P. acknowledged at trial that V.R. was in a good environment with her foster family, and the evidence at trial indicated that V.R. had little to no emotional bond with S.P. or M.R. but that V.R. had a very strong bond with D.R. and the other children in V.R.'s foster home.[22]

Again, giving due consideration and deference to all of the evidence, we hold that the trial court could have reasonably formed a firm belief or conviction that termination was in V.R.'s best interest and thus that the evidence was legally and factually sufficient in that regard. We therefore overrule S.P.'s and M.R.'s third issues.

### Conclusion

Having overruled all three of each of S.P.'s and M.R.'s issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL: LIVINGSTON, WALKER, and MCCOY, JJ.

---

[22] A Department caseworker testified that the foster family is "very loving. It's a very stimulating and educational environment. They treat [V.R.] as one of their own. The kids have been very concerned about the trial going on. They ask every day. They love her very much." The caseworker also testified regarding V.R.'s bond to her brother D.R., "[D.R.] will not let [V.R.] out of his sight. . . . They came and picked up [V.R.] without his knowledge and . . . [h]e was very upset. That is like his rock. He is very, very attached to his sister."

24

DELIVERED:  July 30, 2009